**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**GABRIEL M. MARTINEZ,**

**vs.**                                                                                          **Civil No. 03-500 JH/RLP**

**JO ANNE B. BARNHART,
Commissioner of Social Security,**

       **Defendant.**

**MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION**[1]

This matter comes before the court on the Motion of Plaintiff, Gabriel M. Martinez ("Plaintiff" herein) to reverse or remand the decision of the Commissioner of Social Security denying his applications for disability income benefits ("DIB" herein) and supplemental security income ("SSI" herein).

**I.     Procedural Background**

Plaintiff filed applications DIB and SSI on May 27, 1998, alleging an onset date of May 15, 1998. An administrative hearing regarding Plaintiff's claims was held by Administrative Law Judge Richard Smith. On April 13, 2001, ALJ Smith found Plaintiff disabled and awarded benefits. (Tr. 37-76, 111-118).

On May 17, 2001, the Division of Disability Quality Operations referred Plaintiff's claim to the Appeals Council for Own-Motion Review. (Tr. 150-153). On June 11, 2001, the Appeals Council

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that part may, pursuant to 28 U.S.C.A. §636(c)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

advised Plaintiff of its intent to remand his case to the ALJ for additional proceedings.[2] The letter from the Appeals Council to Plaintiff and his attorney stated that additional evidence or further written statements could be submitted within thirty days, and that no order of remand would be issued until that time.(Tr. 155). No additional evidence or statements were sent to the Appeals Council. (Tr. 562). The Appeals Council issued its Remand Order on October 23, 2001, vacating the ALJ Smith's decision, and remanding for additional proceedings, to include but not limited to consideration of Plaintiff's maximum residual functional capacity, and the obtaining of testimony from a vocational expert. (Tr. 157-160). Plaintiff continues to receive interim benefits while this matter is on review.[3]

On May 14, 2002, Administrative Law Judge Carol Conner conducted a second administrative hearing. On November 13, 2002, ALJ Conner issued her decision. She found that the combination of degenerative joint disease of the knees and lumbar spine, Major Depression, chronic, and borderline intellectual functioning were severe impairments, that Plaintiff did not suffer from a listing level impairment; that Plaintiff was not entirely credible; that he could not return to his past relevant work but that he retained the residual functional capacity to perform work identified by a vocational expert, which was available in significant numbers in the national economy. (Tr. 12-26).

On February 23, 2003, the Appeals Council declined to assume jurisdiction over Plaintiff's case, making the ALJ's November 13, 2003 decision the final decision of the Commissioner.[4]

---

[2]The Appeals Council may "adopt, modify, or reject" an ALJ's recommended decision. §§20 C.F.R. 404.979, 416.1479 (1986). While the regulations specify certain instances when the Appeals Council will review a disability case, §§20 C.F.R. 404.970(a), 416.1470(a) (1986), the Appeals Council may also take additional action on any recommended decision from an ALJ. See Fierro v. Bowen, 798 F.2d 1351, 1354 (10th Cir.1986), cert. denied, 480 U.S.945, 107 S.Ct. 1602, 94 L.Ed.2d 789 (1987).

[3]20 C.F.R. §404.969(d); See Tr. 155.

[4] Doyal v. Barnhart, 331 F.3d 758, 759 (10th Cir.2003); Fierro, 798 F.2d at 1353-1354.

## II.   Standard of Review.

The court reviews the decision of the Commissioner to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.[5] The Supreme Court has held that "substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6]  In reviewing the record to determine whether substantial evidence supports the Commissioner's decision, the court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner.[7]  Evidence is not considered substantial "if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion."[8]

The court also reviews the decision of the Commissioner to determine whether the Commissioner applied the correct legal standards.[9]

## III.   Factual Background

Plaintiff was born on January 1, 1961.  (Tr. 169).  He attended special education classes, left school in the 9th grade, and is functionally illiterate.  (Tr. 194, 271).  He has previously worked as an electricians helper. (T. 80, 104).   He contends that he is disabled due to  pain (Tr. 83, 86, 215)

---

[5] Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1028 (10th Cir.1994).

[6] Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

[7] Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir.2000) (citing Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir.1991)).

[8] Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir.1985) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983)).

[9] Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir.1994); Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir.1994).

and mental impairments (Tr. 84, 94-95, 215).

<u>Physical Impairments</u>

The medical records confirm that Plaintiff suffers from severe degenerative joint disease of both knees with audible crepitus and pain[10]. (Tr. 259, 222-223, 453, 440-442, 561-562, 427). His knees are "stable,"(Tr. 230, 440, 442), he retains full range of motion (Tr. 230, 545), can bear weight (Tr. 442), but does have intermittent problems with gait. (Compare e.g., Tr. 502-503 with Tr. 230).

Plaintiff suffers from back pain. The first recorded examination of Plaintiff's back was on October 20, 1997, when Cedric Simpson, M.D., noted "(+) tender R paraspinous mm min" and diagnosed "Osteoarthritis, primary, multiple." (Tr. 222).

On September 15, 1998, Franklin Miller, M.D., an internist, evaluated Plaintiff at the request of the Disability Determination Unit. Dr. Miller indicated that there was no back spasm, that Plaintiff's back had full range of motion and that the sensory examination was normal to light touch, proprioception and vibration. He diagnosed multiple arthralgias[11]. (Tr. 229-230).

On September 14, 1999, Plaintiff was evaluated by Jaye Swoboda, M.D. (Tr. 448, 453-454). Dr. Swoboda noted no back abnormality, and described Plaintiff as muscular and well developed. On October 19, 1999, Dr. Swoboda noted that Plaintiff had "good posture, mobility, no focal tenderness and modest paraspinous spasm." (Tr. 449). He diagnosed noninflammatory degenerative joint disease, and stated "I do not see any basis for disability at this point but further evaluation and

---

[10] Many of Plaintiff's pain complaints are recorded in extensive mental health care records prepared in connection with treatment for depression and chronic pain. Those records do not contain physical examinations or diagnostic tests.

[11] "Pain in a joint, especially one not inflammatory in character." <u>Stedman's Medical Dictionary</u>, 27th Ed.

failure of therapeutic trials may indicate that is the only route to go." Id.

On February 15, 2000, Plaintiff was evaluated by Michael White, a physician's assistant, complaining of pain all over his body. (Tr. 439). Mr. White examined Plaintiff's knees, but did not record an examination of his back, other than to note that x-rays of the cervical and lumbar spine taken two weeks earlier were negative. (Tr. 463, 442-43).

On February 24, 2000, Frank Lawlis, PhD, a clinical psychologist and specialist in pain medicine practicing with New Mexico Cancer Care Associates, wrote preliminary report addressed to Plaintiff's attorney. Dr. Lawlis documented unilateral muscle spasms down Plaintiff's right leg, but failed to describe any examination of Plaintiff's back. (Tr. 435).

In March 2000, Dr. Bradford Cambron ordered an MRI which revealed disk bulges or herniations from L3-S1 and a mild bulge or hernation at T9-10, without cord abnormality. (Tr. 461). On follow up office visit of April 4, 2000, Dr. Cambron noted that Plaintiff's back popped on bending over, and that his muscle tone was generally increased. He prescribed medication and advised Plaintiff to return in one month. (Tr. 440-441).

Plaintiff did not return to Dr. Cambron, and was not seen again for back complaints until February 24, 2001, when he was evaluated by Dr. A.L. Rodriguez. Plaintiff had been referred to Dr. Rodriguez by the Department of Human Services with regard to an application for general assistance. (Tr. 437). Dr. Rodriguez recorded the following exam

> O:   Gen - walk in slow delib. steps. Audible crepitus fr. knees. Back brace. HEENT unremarkable. Back - tense paraspinals b/l, nl alignment.
> 
> \* \* \*
> 
> M/S 5/5 strength x 4, 2+ DTR's x 3, no DTR (l) knee, sen. intact. Unable to fully extend shoulders b/l (100 degrees) secondary to pain, decreased rotation right compared to left.

   A:  (1) Severe DJD - knees b/l  (2) disc herniation - limits activities.

Dr. Rodriguez advised Plaintiff to use Celebrex and to return for follow up in 2-3 months, or sooner as needed.

  Dr. Mel Olivares became Plaintiff's treating physician as of July 3, 2001. Tr. 562). He saw Plaintiff on eight occasions between July 3, 2001 and April 25, 2002. Although he noted Plaintiff's history of thoracic and lumbar disc herniation, none of his treatment notes records an examination of Plaintiff's lumbar or thoracic spine. (Tr. 555-562). On most visits, back pain was not listed as a patient complaint. (Tr. 561, 560, 559, 558, 557, 556). On April 25, 2002, Dr. Olivares noted that Plaintiff had neck pain and weakness in his arms, attributing these findings to an auto accident. (Tr. 555). On May 22, 2002, Dr. Olivarez wrote a letter to Plaintiff's attorney, stating that he had

> confirmed muscle spasm in [Plaintiff's] neck and upper back. . . pain muscle spasms (sic) and significant limitation of motion in his spine and significant motor loss and muscle weakness and sensory/reflex loss. . . I did in fact view regulations you sent met with respect to social security and the disorders of the spine and find that he does, in fact, fall within those criteria under 1.05C.[12]

(Tr. 545).

Mental Impairments

  Plaintiff suffers from limited intellectual capability. Carl B. Adams, PhD., evaluated Plaintiff on behalf of the DDU on January 7, 1999. Dr. Adams stated that based on testing results, Plaintiff exaggerated his mental limitations. Taking this into consideration, he diagnosed mild mental retardation with learning disorders in reading, writing and mathematics. (Tr. 241-246). Dietrich Busch, M.D., one of Plaintiff's treating psychiatrists, diagnosed borderline intellectual functioning based on clinical evaluation. (Tr. 271-275).

---

[12] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05 (2000), which is now codified in § 1.04.

Plaintiff suffers from depression. Although Dr. Adams, who evaluated Plaintiff on only one occasion, found no evidence of clinical depression, he did describe Plaintiff as cautious, guarded, evasive, not trusting and detached. (Tr. 241-246). All other mental health professionals who have examined or treated Plaintiff have diagnosed some level of depression, generally related to chronic pain:

--On March 8, 1999, Valerie Aragon, a licenced social worker with community mental health services, assessed Plaintiff as suffering from a mood disorder, and referred him for psychiatric evaluation. (Tr. 263-269).

--Dietrich Busch M.D., conducted a psychiatric evaluation in June 1999. On mental status examination he noted mild impairment in orientation, intermediate and short term memory, abstraction, insight, long term memory loss without cognitive impairment, minimal to mild depression at the time of exam with history of severe depression on other days, and mild, chronic suicidal ideation without plan. Dr. Busch diagnosed Major Depression of long duration.

--Following Dr. Busch's evaluation, Plaintiff was placed on antidepressant medication and attended group therapy sessions. During those sessions he was described as mildly depressed (Tr. 306, 314, 324, 352-3, 362-3) and chronically depressed. (Tr. 309). Dr. Busch continued to describe him as mildly depressed. (Tr. 511).

--Gerald Russell, PhD, conducted a neuropsychological evaluation on Plaintiff in August 2001. (Tr. 467-471). Testing indicated that he was over-reporting or "faking bad" with regard to emotional and cognitive symptomotology, but that his complaints of pain were credible. Dr. Russell went on to state that testing was consistent with multiple neurotic

7

symptoms, including depression, nervousness, and obsessions, that are chronic and enduring. Dr. Russell concluded that Plaintiff suffered from severe levels of depression and chronic pain.

**IV.  Issues Raised**

Plaintiff raises the following issues:

A. Whether the Judge Smith's decision was improperly vacated.

B. Whether ALJ Connor failed to develop the record.

C. Whether the ALJ erred by failing to credit Dr. Olivares' opinion that he met the criteria of Listing §1.04C

D. Whether the ALJ erred in her vocational assessment.

**V.  Analysis**

**Whether the Commissioner improperly vacated the decision of ALJ Smith**.

The Appeals Council vacated ALJ Smiths decision pursuant to §20 C.F.R. 404.970(a)(3), stating that his finding that Plaintiff retained the residual functional capacity for less that sedentary work was not supported by substantial evidence. (Tr. 154, 158). The claim was remanded for additional proceedings, pursuant to § 20 C.F.R. 404.977. I find no merit in Plaintiff's claim that ALJ Smith's decision was improperly vacated. Since the decision of ALJ Smith is not a final decision[13], it is not subject to review by this court. §42 U.S.C.A. 405(g).

**Whether ALJ Connor failed to properly develop the record.**

Plaintiff contends that the ALJ failed to develop the record because she did not have before her the treatment records of his family practitioner, Dr. Olivares. At the hearing, the ALJ asked Plaintiff's attorney if the record was complete. The attorney stated that she had not obtained the

---

[13]Fierro, 798 F.2d at 1353 fn 2.

records of Dr. Olivares, and requested an additional ten days to obtain and submit them to the ALJ. (Tr. 77). The ALJ left the record open for the additional ten days. The May 22, 2002, letter from Dr. Olivares was submitted, but his treatment records were not. The ALJ discounted the opinions in the May 22, 2002 letter because they were not supported by Dr. Olivares' treatment records, and were not consistent with other substantial evidence.

Although the ALJ has a duty to develop the record, "it is not the ALJ's duty to be the claimant's advocate."[14] The ALJ's duty is only "one of inquiry and factual development."[15] The ALJ considered Dr. Olivares' May 22 letter, and stated her reasons for rejecting the opinions stated therein. I find that the ALJ's reasons for rejecting those opinions complied with appropriate legal standards, as is more fully explained, infra. Under these facts, I find that the ALJ complied with her duty to develop the record.

**Whether the Commissioner's finding that Plaintiff's impairment did not meet or equal listing §1.04C is supported by substantial evidence and the application of correct legal principles.**

At step three, the ALJ must determine whether the claimant has an impairment "equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."[16] The ALJ must make this determination solely on medical evidence.[17] To do so, the ALJ "compare[s] the symptoms, signs, and laboratory findings about [a claimant's] impairment(s), as shown in the medical evidence [associated with the claim], with the

---

[14] Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir.1993)

[15] Id.

[16] Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988) (quotation omitted).

[17] See §20 C.F.R. 404.1526(b).

9

medical criteria shown with the listed impairment."[18]  At step three, the claimant has the burden of demonstrating, through medical evidence, that his impairments "meet all of the specified medical criteria" contained in a particular listing.[19]

Under Listing 1.04C, an individual is considered disabled if he or she meets the following criteria:

> C.  Other vertebrogenic disorders (e.g., herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months.  With both 1 and 2:
>
> 1.  Pain, muscle spasm and significant limitation of motion in the spine;  and
>
> 2.  Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt.  P., App. 1, § 1.05C.

The medical evidence establishes that Plaintiff has herniated or bulging discs in his lumbar and thoracic spine.  (Tr. 461). However, the ALJ correctly observed that other medical signs required by the Listing are not present.[20]  (Tr. 17).  The ALJ discredited the opinions expressed in Dr. Olivares' letter because they were not corroborated by his own treatment records, and were inconsistent with records of other treating sources.  Dr. Olivares' treatment notes did not record examination of Plaintiff's back, and none of the objective medical criteria required by Listing §1.04C is mentioned.

---

[18] §20 C.F.R.  404.1526(a).

[19] Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

[20] The ALJ cited to Tr. 230, an examination in September 1998, which documented full range of motion with no spasm; Tr. 449, an examination on October 19, 1999,which documented good positive mobility and muscle tone, with no focal tenderness and only modest paraspinsous spasm; see also, Tr. 437, examination on February 24, 2001, which documented 5/5  muscle strength in all extremities with intact sensation.

(Tr. 555-562). A treating physician's opinion is not dispositive on the ultimate issue of disability[21], and may be disregarded if not well-supported, or if inconsistent with other substantial evidence.[22]

I find that had Dr. Olivares' treatment notes been available to the ALJ, it would not have altered her finding that Plaintiff did not establish the medical criteria necessary for a finding of disabled under Listing §1.04C. I further find that substantial evidence and the application of correct legal principles supports the ALJ's findings that Plaintiff did not establish a disability under Listing §1.04C.

**Whether the ALJ's assessment of Plaintiff's residual functional capacity ("RFC" herein) was supported by substantial evidence.**

"A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability."[23] In arriving at an RFC, agency rulings require that an ALJ must provide a "narrative discussion describing how the evidence supports" his or her conclusion.[24] The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis ... and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."[25] The ALJ "must also explain how any material inconsistencies or ambiguities in the case record were considered and resolved."[26] "The RFC

---

[21] Castellano v Secretary of Health & Human Services, , 26 F.3d 1027,1029 (10th Cir. 1994).

[22] §20 C.F.R. 404.1527(d)(2).

[23] Williams, 844 F.2d at 751.

[24] See SSR 96-8p, 1996 WL 374184, at *7.

[25] Id.

[26] Id.

assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence."[27]

The ALJ found that Plaintiff

has had a residual functional capacity for work that does not require sitting, standing and walking for extended periods during the work day, lifting and carrying more than ten pounds frequently and 20 pounds occasionally, permits a change in position during the workday as needed, does not require more than occasional bending, stooping, climbing and crawling, and involves work that does not require more than one or two step simple tasks.

Despite the claimant (sic) borderline intellectual capacity and depression, I am persuaded he retains sufficient mental capabilities to understand, carry out and remember simple one or two step instructions, use judgment for this type of work, respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.

With regard to physical limitations, his back and knee pain would limit his ability to lift and carry more than 10 pounds frequently and 20 pounds occasionally. He is unable to sit, stand and walk for extended periods, and must be allowed to change positions for comfort during the work day. He cannot climb, bend, stoop or crawl on more than an occasional basis.

(Tr. 25).

Plaintiff's counsel states that he has reviewed the entire record, and can not find medical or psychological evidence to support the ALJ's findings. Although not segregated in a discrete section of her decision, the ALJ did cite to the following in support of her RFC findings:

*--Plaintiff's testimony regarding the extent of his intellectual functioning was discredited by the opinions of Drs. Adams and Russell, who both indicated that he exaggerated intellectual or emotional difficulties. (Tr. 19-20, referring to Tr. 244-245 & 479).*

Dr. Adams evaluated Plaintiff's intellectual function. He stated that Plaintiff was

---

[27] Id.

inconsistent in both report and presentation. Taking this into consideration, however, he felt that Plaintiff was functioning in the borderline to mild range of mental retardation. (Tr. 245).

Dr. Russell evaluated Plaintiff for cognitive and psychological functioning. He stated that Plaintiff's testing profile indicated he was "faking bad, but did have serious emotional and physical difficulties. (Tr. 470-471).

*--Plaintiff was able to concentrate and relate well during intellectual testing, and maintained appropriate pace. (Tr. 21).*

The ALJ's finding is supported by a treatment note by Robert Ray, who administered some of the testing for Dr. Russell:

> The client seemed to grasp the questions easily, and just be superficial response, or my initial intuition, is he seems to be consistent, at least in his answers. The client seemed to grasp the questions with few exceptions, as soon as they were read. Sometimes he would think about it for a few moments, but then give an answer.

(Tr. 497).

*--Plaintiff was able to concentrate in simple tasks as evidenced from his report of working for several weeks removing paint from an historic building. (Tr. 21, referring to Tr. 440).*

Although Plaintiff testified that the job removing paint lasted only an hour or two (Tr. 94), he told his physician that it lasted several weeks. (Tr.440).

*--Plaintiff suffers from Major Depression, which can be controlled by medication and counseling. (Tr. 21, 23). Plaintiff reports no symptoms of depression when he is compliant with his treatment regime (sic). (Tr. 24).*

The medical record indicates that Plaintiff's symptoms of depression are ameliorated

13

but not eliminated with medication management and counseling. Plaintiff started taking Zoloft, an antidepressant medication, in August 1999. (Tr. 318). As of December, 1999, his mental health counselor noted improved coping skills and reduced (but not eliminated) periods of depression, provided he took his antidepressant. (Tr. 330-331, 372-375). In March 2000, Plaintiff reported that he had stopped taking Zoloft because it no longer seemed to be working. (Tr. 388-389, 336-337). After restarted the medication he was described as "mildly depressed." (Tr. 398, 400, 407-408). By August he indicated that Zoloft helped "greatly" with his symptoms of depression. (Tr. 411-412). At his next counseling visit in October 2000 he was in a "good mood" (Tr. 413-414), and later that month admitted that if he forgot to take his medication he would become depressed and nervous. (Tr. 415-416). In November 2000, Plaintiff received authorization for continued counseling to treat symptoms of extreme depression. At that time a social worker indicated that he was reporting symptoms of low energy, worthlessness and poor eating, despite recent increase in his dosage of Zoloft. (Tr. 348, 417-418). By December 2000 his depression was "in fair remission" (Tr. 423), and he stated that overall his depression had improved. (Tr. 428). Plaintiff stopped counseling sessions in February 2001. His depression worsened, and the dosage of antidepressant was again increased. (Tr. 518, 514). The following month, his mother died, causing regression of his psychiatric condition. (Tr. 510-511). In July 2001, after he had been advised that his award of benefits was under review, he reported increased depression. (Tr. 500). His new psychiatrist, Dr. Gzaskow, diagnosed Major Depression, severe/recurrent with no

psychosis. and continued medication and individual counseling. On November 5, 2001, Dr. Gzaskow noted mild anxiety and chronic depression. (Tr. 490-491). At about this time, Plaintiff stopped going to individual counseling sessions, although he continued to see Dr. Gzaskow. In January 2002 he attempted suicide by slashing his wrist and arm. (Tr. 483, 487, 558). Dr. Gzaskow suggested adding Neurontin[28], which was prescribed by Dr. Olivares on February 5, 2002. (Tr. 487, 558). Within nine days, Plaintiff's reported improvement (Tr. 557) and by April, Dr. Gzaskow noted that Plaintiff was under less stress, exhibited better mood, and that his mental status examination was normal. (Tr. 477-478).

*--Plaintiff drives his own vehicle. (Tr. 23, referring to Tr. 91-92).*

*--Plaintiff spends his days visiting family and friends. (Tr. 21, referring to Tr. 244).*

*--Plaintiff lives alone and can maintain his residence. (Tr. 20, referring to Tr. 85, 90). He prepares and cooks his own meals (Tr. 20, referring to Tr. 181); he shops alone when he doesn't have to stand in line too long. (Tr. 20, referring to Tr. 90, 180) He can carry a bag a groceries and lift a gallon of milk. (Tr. 20, referring to Tr. 90-91).*

I find that the ALJ adequately supported her assessment of Plaintiff's RFC with substantial evidence, and that she included in her hypothetical question to the vocational expert those limitations which were supported in the record..[29]

---

[28] Plaintiff indicated in written materials that Neurotin was prescribed to treat depression. (Tr. 220).

[29] Plaintiff contends that the ALJ failed to include two impairments in the hypothetical question posed to the VE, reduced grip strength and slow gait. Plaintiff's grip strength was measured as 5/5 on June 19, 1996, 4/5 on July 15, 1998, and extremity strength was measured as 5/5 on February 24, 2001. (Tr. 259, 229,437). There is no medical evidence that Plaintiff's reduced grip strength on July 15, 1998 continued. Accordingly, the ALJ was not required to include reduced grip strength in her hypothetical question. See Gay

**VI     Recommended Disposition**

For the reasons stated herein, I recommend that Plaintiff's Motion to Reverse or Remand be denied, and that the decision of the Commissioner denying Plaintiff's applications for DIB and SSI be affirmed.

_____
Richard L. Puglisi
United Stated Magistrate Judge

---

v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993) (hypothetical posed to VE need not include impairments not established by the evidence.).  The ALJ asked the vocational expert to assume an inability to "sit, stand and walk for any extended period of time."  (Tr. 104).  I find that is description adequately took into account Plaintiff's impairment in walking.